5 F.3d 537
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 Jose Angel JUAREZ-MARTINEZ, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 92-70215.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 15, 1993.
Decided Sept. 8, 1993.
 
 1
 Petition for Review of an Order of the Board of Immigration Appeals, Board of Immigration Appeals Docket No. Abt-dkn-elm.
 
 
 2
 I.N.S.
 
 
 3
 AFFIRMED.
 
 
 4
 Before: HUG and LEAVY, Circuit Judges and REAL,* Chief District Judge
 
 
 5
 MEMORANDUM**
 
 
 6
 Petitioner JOSE ANGEL JUAREZ-MARTINEZ (JUAREZ) is a native of Honduras who illegally entered the United States on May 30, 1990. On May 31, 1990 the Immigration and Naturalization Service (INS) initiated deportation proceedings. JUAREZ was found deportable by the Immigration Judge (IJ). JUAREZ was ordered to be deported. He appealed to the Board of Immigration Appeals (BIA) that affirmed the IJ's decision.
 
 
 7
 We review the ruling of the BIA denying eligibility for asylum or withholding of deportation under the substantial evidence standard. We affirm.
 
 FACTS
 
 8
 At his deportation hearing JUAREZ conceded deportability so the IJ proceeded to determine the claim filed by JUAREZ for asylum.
 
 
 9
 JUAREZ testified at his hearing that he feared several members of two guerrilla groups in Honduras. As a result of this claimed fear he left the Honduran military service in 1984. He had been inducted into the Honduran military in 1976. From 1976 to 1980, his job was repairing and packing parachutes.
 
 
 10
 He was again forced into the military in 1982, when in addition to his parachute duties he was assigned duties in the investigation of subversive activity. He claimed that as part of these duties he assisted in capturing and interviewing members of guerrilla groups, asking them questions about where they were born and what they were doing in Honduras. He denied using physical force or threats during these interviews. Some of these guerrilla group members were from his home town of El Progresso.
 
 
 11
 JUAREZ testified he left the army in 1984 and returned to El Progresso. He began receiving one or two anonymous letters a day telling him to leave El Progresso or he would be killed. In addition to the letters, several individuals, one of whom he recognized as a member of a guerrilla group, would drive by his house displaying rifles, machine guns, shot guns and pistols. These anonymous notes and drive-bys continued for about one year. JUAREZ claimed he did not go out of his parent's house during that year.
 
 
 12
 He then left his parent's house to live on his uncle's ranch, that he described as being in an extremely secluded area. He claimed the ranch became less secluded when a new road was built near the ranch, causing him fear, and so he came to the United States in 1988.
 
 
 13
 Deportation proceedings were commenced against him, and in March of 1989 he was granted the privilege of voluntary departure from the United States. He did not depart and in September 1989 he was deported.
 
 
 14
 JUAREZ claimed that when he returned to Honduras, a woman saw him walking on the street and pointed to him saying "there [sic] he is." JUAREZ described the woman as a teacher who was a friend of the guerrilla member he had previously recognized. He then returned home and stayed until he returned to the United States in 1990.
 
 
 15
 JUAREZ further testified that the anonymous letters and drive bys resumed upon his return to his home. He further testified that he could not live safely anywhere in Honduras because he thought he had been photographed in 1984, and feared these photographs had been spread throughout Honduras.
 
 
 16
 On cross-examination JUAREZ stated that his parents, four sisters and two brothers still lived in Honduras without incident from guerrilla sources. Both brothers had served in the military without incident.
 
 
 17
 The IJ determined that petitioner was deportable and did not meet his burden for either asylum or withholding of deportation. The IJ denied voluntary departure based upon JUAREZ's previous opportunity to voluntarily depart and his failure to do so. The BIA dismissed his appeal, finding JUAREZ had not demonstrated entitlement to asylum.
 
 DECISION
 
 18
 Title 8 U.S.C. Sec. 1158(a) provides the Attorney General (exercised through the INS) the discretion to grant asylum to a refugee, i.e. one who is unable to return to his or her country "because of persecution or well-founded fear of persecution on account of ... political opinion." 8 U.S.C. Sec. 1101(a)(42)(A). Asylum pursuant to 8 U.S.C. Sec. 1158(a) requires a "well-founded fear of persecution," 8 U.S.C. Sec. 1101(a)(42)(A), and imposes on the petitioner the burden of proof. Rebollo-Jovel v. INS, 794 F.2d 441 (9th Cir.1986).
 
 
 19
 The record supports the findings and rulings of the IJ and the BIA. JUAREZ does not set forth facts of an objective or reasonable fear of what can best be described as speculation and guesses of who and why the persons and events he described would have selected him for any persecution. His are only vague references to events that never resulted in any overt movement to injure him in any way.
 
 
 20
 The decision of the BIA is supported by substantial evidence and we AFFIRM.
 
 
 
 *
 The Honorable Manuel L. Real, Chief United States District Judge for the Central District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3